**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NICK AQUILINO, et al.,

               Plaintiffs,

v.

HOME DEPOT, U.S.A., INC.,

               Defendant.

Civil Action No.: 04-04100 (PGS)

**OPINION**

       This matter comes before the Court on a motion to decertify a conditional collective action, filed by Home Depot U.S.A., Inc. (hereinafter Home Depot or "Defendant"). Edward Novak and Ahmed Elmaghraby (collectively "Plaintiffs") are former assistant store managers for Home Depot, who allege that they and other merchandising assistant store managers (MASMs) were misclassified as exempt from the overtime requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq. Plaintiffs were granted conditional collective action certification on September 6, 2006. Defendant now moves to decertify the conditional collective action, arguing that Plaintiffs cannot meet the burden of establishing that they are similarly situated to the proposed class, as required to obtain their final collective action certification. For the following reasons, the Court grants Defendant's motion to decertify the conditional collective action and declines to create certified subclasses for declaratory relief or training period overtime claims.

## I.      PROCEDURAL HISTORY

On August 25, 2004, Plaintiff Novak initiated this action, alleging that Defendant violated the FLSA, New Jersey law, and the state laws of twenty-four other states.  Shortly thereafter, in October 2004, Plaintiff Novak's case was consolidated with *Aquilino v. Home Depot, Inc.*, which was filed on the same day as *Novak*.[1]

On April 1, 2005, Plaintiffs moved under § 216(b) of the FLSA for conditional certification of a nationwide opt-in collective action, consisting of "all similarly situated former and current Merchandising Assistant Store Managers."  In October 2005, Magistrate Judge Ronald Hedges granted Plaintiffs' request for conditional collective action certification, and on September 6, 2006, this Court affirmed the conditional certification.  *Aquilino v. The Home Depot, Inc.*, No. 04-4100, 2006 U.S. Dist. LEXIS 66084 (D.N.J. Sept. 6, 2006).   In affirming, this Court explained that it was utilizing a "less stringent" standard for certification because it was the "early phase" of the proposed collective action.  *Id.* at *5.  However, this Court expressly stated that conditional certification "may be revisited (by a motion for decertification), if it later appears, after appropriate discovery, that the additional plaintiffs who opt in the law suit are not similarly situated."  *Id.*  In November 2006, Plaintiffs sent notice of the collective action to approximately 12,728 current and former Home Depot MASMs.  Initially, 1747 Opt-In Plaintiffs (Opt-Ins) joined in the litigation; however, only 1502 Opt-Ins remain due to either dismissal for failure to comply with discovery orders or voluntary withdrawal of claims.

Concurrently, in December 2005, Plaintiffs moved for class certification under Fed. Rule Civ. P. 23(b)(3) and requested creation of a separate state class for each of the twenty-five state law

---

[1]Former Plaintiff, Nick Aquilino, whose name still appears in the caption of this case, is no longer a party to this  action.

claims. On July 17, 2006, this Court denied class certification under Rule 23(b)(3), concluding that the state law claims predominated over the federal law claims. *Aquilino v. Home Depot U.S.A., Inc.,* No. 04-4100, 2006 U.S. Dist. LEXIS 48554 (D.N.J. July 17, 2006).

Plaintiff Novak filed his New Jersey class claims in New Jersey state court on August 17, 2006, and then removed the action to federal court on October 10, 2006. He moved, under Rule 23(b)(2) and (3) for class certification of current and former MASMs that worked in Home Depot stores in New Jersey. This Court denied Plaintiff Novak's request for certification of a class of New Jersey MASMs on August 27, 2009. *See Novak v. Home Depot U.S.A., Inc.*, 259 F.R.D. 106 (D.N.J. 2009) ("*Novak II*"). Defendants now seek to decertify the conditional collective action certification, which was granted pursuant to § 216(b) of the FLSA.

## II.    BACKGROUND

Defendant Home Depot is a national retail store that sells home improvement products and services. Home Depot has created the position of MASM. MASMs are the second-highest ranking employee in a Home Depot, subordinate to only the store manager. Each store employs between one and seven MASMs.

At the heart of this case is whether MASMs were misclassified as exempt from the FLSA; thus, it is necessary to review the responsibilities and duties of a MASM that would be considered when deciding whether a position could qualify as exempt. Looking to the deposition testimony of the Opt-Ins it is apparent that MASM testimony about job responsibilities and duties varies from MASM to MASM. Variations are evident in the type of exempt work that the Opt-Ins performed, the extent of the Opt-In MASMs' authority over subordinate employees, and the amount of time that the Opt-Ins spent performing exempt work.

A.      MASM Performance of Exempt Work

The MASMs have differing descriptions of how they directed and supervised employees,

planned work for employees, ordered inventory, and ensured safety, security, and legal compliance

within Home Depot stores.

There is wide variation in how MASMs directed and supervised employees.  There is no

uniformity in how often MASMs directed the work of subordinate employees.  Jason Yount delegated

on a daily basis, whereas Angela Ashworth delegated tasks "every day or once a week," depending

on the "actual need of the department."  Frederick Carter noted that when a department head was

absent, he may have to "show" the subordinate employees how to complete the work and "do it with

them."  As for supervising employees, Andrew Goldring summarized that his supervision was

"relative to the person and relative to traffic, it's relative to different departments of what has to get

done."  Connie Healy's supervisory responsibilities depended on "a lot of situational things," and

would increase and expand if she was in charge of more departments.  In contrast, Christopher Akeret

admitted that he "never really watched associates."

MASMs apparently had discretion to determine how to plan or delegate the work within their

departments.  A portion of MASMs utilized work lists to plan the work within their departments, but

it does not appear that this was done in a consistent way by each MASM.  Some MASMs prepared

the work lists themselves, while others delegated the job of creating work lists to department

supervisors.  The work lists also did not cover a uniform time period in that some were created daily

and some were created weekly.  There was also no uniformity over MASMs conducting staff

meetings to plan and delegate work assignments – MASM Jerry Walls conducted store meetings two

to three mornings per week; Alan A'Neals and Ashworth conducted weekly staff meetings; Greg

4

Beyroutey held department meetings once every two to three months; and Dina Dixon held both weekly staff meetings, as well as biweekly meetings with her department heads.

The MASM testimony bears out that MASM ordering authority was inconsistent. Joel Weinstein explained that to discern the authority that MASMs had to order, it would be necessary to go store to store and speak to each MASM individually. Such testimony is indicative of the spectrum of authority given to MASMs to order products. At one end of the spectrum are MASMs who acknowledged that they played an active role in ordering the products for their departments. Then, there are MASMs who played a more minimal role in ordering because the store managers monitored and controlled all of the ordering for the store. Finally, there are MASMs who maintain that Inventory Management Associates and Operations Assistant Store Managers retained primary control over the entire ordering process.

Deposition testimony also reveals discrepancies in how MASMs approached resolving employee concerns and grievances and effectuating safety and security within the Home Depot stores. The handling of employee grievances was a regular responsibility for some MASMs. However, a portion of MASMs testified that they had no role in addressing employee grievances. When it came to safety and security, there were MASMs that self-described a high level of ownership and responsibility for safety and security within their respective stores – Healy constantly monitored the store for safety hazards; Dixon conducted opening and closing safety walks, provided safety reminders at opening and closing meetings, and monitored possible theft situations on a daily basis; Amanda Adamson developed a hazmat compliance program for disposing of waste in the paint department; and Araceli Mendoza utilized a safety checklist when opening and closing the store. Conversely, Elmaghraby did not express an enhanced responsibility for safety and security in the store

5

due to his position as a MASM; he explained that "every associate in the building [was] responsible for safety."

MASMs described their role in ensuring that store employees abided by store policies and legal requirements to differing extents and in different ways. William Boyce would observe workers on the floor to ensure that they were not violating Home Depot's sexual harassment policy, antidiscrimination policy, or the code of conduct. Dixon explained her efforts towards ensuring legal compliance by explaining that she would walk the sales floor to see if there was any improper conduct and to ensure that no one was harassed or discriminated against. Healy acknowledged that she was responsible for ensuring that employees did not engage in harassment or discrimination, but she also had a practice of referring potential legal issues to human resources. Yet, Davis's expression of his responsibility for guaranteeing that no harassment or discrimination took place is altogether different; he claimed no responsibility, stating instead that it was the responsibility of human resources to handle such situations and that employees would go to human resources or the store manager for such complaints.

### B.     The Authority of MASMs Over Subordinate Employees

The authority of MASMs over subordinate employees in regards to hiring, promoting, evaluating, disciplining, and terminating employees is not consistent from MASM to MASM. To illustrate, some Opt-Ins like Jenny Macias and Kevin McVannan recruited, interviewed, and hired associates, but other Opt-Ins, like Donald Furbush, claimed no role in hiring. Still other MASMs participated in interviews and made hiring recommendations, but did not have the sole authority to make final hiring decisions.

There is also divergence in how MASMs described their role in promoting employees. There are MASMs that developed associates for promotion, but there are also MASMs that did not believe that they were expected to develop associates for promotion purposes. MASM A'Neals said that he could independently make hiring decisions and claimed responsibility for promoting over 100 workers to department supervisor. By contrast, MASMs Esau Leal and Akeret maintain that they had no involvement with promotion decisions. It appears that of those who had authority to recommend promotion of associates, such recommendations were not given the same weight. Some MASMs expressed that their recommendations were usually followed, other MASMs' recounted that their recommendations were generally not followed, and some other MASMs stated that they were required to reach consensus on promotion recommendations.

Similarly, there were inconsistencies in how MASMs evaluated employees. MASM A'Neals commented that evaluating employees was an important part of his job and that his evaluation would affect an associate's raise. David Diaz's responsibility for evaluating employees entailed identifying the employee's strengths and creating a plan for the employee's professional development. MASM Edward Spadoni described his role in evaluating employees differently; he would provide the store manager with a recommendation who in turn would make the rating determination. Frederick Carter could input on the reviews, but did not recall writing an entire evaluation.

The authority that MASMs had to discipline and terminate employees was not uniform from MASM to MASM. A group of MASMs alleged that they could independently discipline and did not need approval to discipline. Other MASMs indicated that they could informally discipline employees independently, but that they needed approval before issuing formal discipline. Somewhat differently, another group of MASMs stated that they could not independently issue discipline, rather they needed

assistance from the human resources manager to discipline.  In regards to MASM authority to

terminate employees, some MASMs claim they had authority to terminate employees; others would

make recommendations for termination; others would conduct termination sessions.

### C.    The Amount of Time MASMs Spent Performing Exempt Work

There are great disparities in the Opt-Ins' testimony in regards to the amount of time that the

Opt-Ins spent performing exempt responsibilities and duties.  There are Opt-In MASMs that testified

that a majority, if not all, of their time was spent performing exempt tasks, such as overseeing and

managing employees, delegating work tasks, hiring, evaluating, promoting, etc. . .   But, in direct

contradiction, there are Opt-In MASMs that said that a majority of their time was spent on non-

exempt manual tasks, such as unloading freight, stocking shelves, and assisting customers.  Another

group of Opt-Ins, however, recounted that the amount of time spent on exempt work depended on the

seasons and the departments to which they were assigned.  For example, Andrew Goldring explained

that during the summer months, the high demand of the garden department required him to perform

manual tasks, such as packing out flowers or bringing in trucks, for seventy-five to eighty percent of

his time.

Testimony was also inconsistent when it came to the amount of time that Opt-Ins spent as the

Manager on Duty (MOD).  Cindy Wade explained that the MOD is "responsible for managing the

store."  According to David Rivett, he was MOD "[w]henever [he] was on the clock."  Similarly,

James Porche stated "[b]asically when I get to work, I'm MOD from the time I hit the door until the

time I leave."  Dina Dixon testified that she spent eighty percent of her time as MOD.  In contrast,

Kenneth Terrill recounted that he never served as an MOD because the MOD program was enacted

around the time that he quit his position.  Jerry Walls stated that he worked at one Home Depot store

that had a MOD schedule, but that another store that he worked at did not.

### III.    LEGAL STANDARD: COLLECTIVE ACTION CERTIFICATION

Under the FLSA, employers are required to pay employees covered by the FLSA a minimum wage and overtime for any hours worked by the employee in excess of forty hours per week. 29 U.S.C. §§ 206, 207. However, the FLSA contains an exemption to that mandatory requirement for employees that serve in a bona fide executive, administrative, or professional capacity. *See id.* at § 213(a). An employee qualifies as exempt if he or she meets the following four criteria: the employee (1) receives compensation on a salary basis; (2) is charged with the primary duty of managing the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) the employee customarily and regularly directs the work of two or more employees; and (4) has authority to hire or fire other employees or the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)-(4).

If an employee is not exempt from the requirements of the FLSA and has not been paid for overtime work, the employer is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Section 216(b) of the FLSA provides a mechanism for the recovery of such unpaid wages and compensation, allowing "any one or more employees . . . on behalf of himself or themselves and other employees similarly situated" to bring an action in Federal Court. Such an action is known as a "collective action," and "allows potential [collective action] members who are similarly situated to the named plaintiffs to file a written consent with the court to opt in to the case." *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 495 (D.N.J. 2000) (citing 29 U.S.C. § 216(b)).

The term "similarly situated" is not defined in the FLSA and neither the United States Supreme Court nor the Court of Appeals for the Third Circuit has provided guidance on its meaning. *Manning v. Goldbelt Falcon, LLC,* No. 08-3427, 2010 U.S. Dist. LEXIS 104029, *3 (D.N.J. Sept. 29, 2010) (citing *Kronick v. Bebe Stores, Inc.*, No. 07-4514, 2008 U.S. Dist. LEXIS 78502 (D.N.J. Oct. 2, 2008)).   Therefore, courts in the Third Circuit have followed a two-step analysis set forth in *Lusardi v. Xerox Corp.*, 188 F.R.D. 351 (D.N.J. 1987). *See id; Zavala v. Wal-Mart Stores, Inc.*, No. 03-5309, 2010 U.S. Dist. LEXIS 63530, *5 (D.N.J. June 25, 2010).   The first step of the analysis is conducted in the beginning of the litigation when plaintiffs apply for conditional certification of the collective action, whereas the second step occurs when discovery is mostly complete and the case is ready for trial. *See Manning*, 2010 U.S. Dist. LEXIS 104029, at *3-4.   Therefore, it is possible for plaintiffs to meet their burden in the initial analysis, but fail in the secondary analysis. *Id.*

The inquiry during the first analysis, commonly referred to as the notice stage, is "whether plaintiff's proposed class is constituted of similarly situated employees." *Zavala*, 2010 U.S. Dist. LEXIS 63530, at *5 (citing *Morisky*, 111 F. Supp. 2d at 497).   This analysis occurs early in the litigation when the court only has minimal evidence; thus, the analysis uses a "fairly lenient standard" and usually results in the grant of conditional certification. *Id.* Courts in our district have noted that "some courts require 'nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan in violation of law.'" *Id.* (quoting *Morisky*, 111 F. Supp. 2d at 497) (editing marks omitted).   Once conditional certification is granted, notice is sent to the potential members of the collective action.

The secondary inquiry, commonly known as the "decertification stage," occurs later in the litigation when the case is readying for trial. *Morisky*, 111 F. Supp. 2d at 497.   If the defendant moves to decertify the conditional collective action, then the court will again consider whether the plaintiffs

10

are similarly situated to the remainder of the members of the collective action.  However, plaintiffs are subject to a higher burden of proof during this second inquiry because the court "has much more information on which to base its decision." *Manning*, 2010 U.S. Dist. LEXIS 104029, at *5-6; *see also Zavala*, 2010 U.S. Dist. LEXIS 63530, at *7 (citing *Morisky*, 111 F. Supp. 2d at 497).  To determine at this stage whether the plaintiffs have met their burden of showing that they are similarly situated, the court examines various factors, including (1) the "disparate factual and employment settings of the individual plaintiffs," (2) "the various defenses available to defendants," and (3) "fairness and procedural considerations." *Lusardi*, 118 F.R.D. at 359.

To proceed to trial as a collective action, plaintiffs must meet their burden of establishing that they are similarly situated; otherwise, the conditional collective action will be decertified. *Id.* at 352; *Ingram v. Coach USA, Inc.*, No. 06-345, 2008 U.S. Dist. LEXIS 5935, *13 (D.N.J. Jan. 28, 2008); *Morisky*, 111 F. Supp. 2d at 497.  "Because this often requires a determination as to whether an employee has exempt or nonexempt status, courts examine the employee's duties, responsibilities, salary, and 'time spent performing administrative duties.'" *Ingram*, 2008 U.S. Dist. LEXIS 5935, at *13 (quoting *Morisky*, 111 F. Supp. 2d at 498).  Accordingly, a conditional collective action certification should only be converted into a final collective action certification where "the plaintiffs make some showing that the nature of the  work performed by other claimants is at least similar to their own." *Morisky*, 111 F. Supp. 2d at 498 (internal quotations, citations, and editing marks omitted).

Plaintiffs in this action were previously granted conditional collective action certification on September 6, 2006.  Defendants have now moved for decertification of the conditional certification. Therefore, this Court must now engage in the more rigorous inquiry of whether plaintiffs are similarly situated to the Opt-Ins as required for final collective action certification.

11

**IV.     COLLECTIVE ACTION CERTIFICATION UNDER § 216(b) OF THE FLSA**

**A.     The Disparate Factual and Employment Settings**

The first factor for the Court to consider at the decertification stage is the disparate factual and employment settings of the individual MASMs.  Because the underlying issue is whether Home Depot properly classified MASMs as exempt from the FLSA, deciding whether members of the MASM collective action are similarly situated requires "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria."  *Morisky*, 111 F. Supp. 2d at 498; *King v. West Corp.*, No. 8:04CV318, 2006 U.S. Dist. LEXIS 3926, *43 (D.Neb. Jan. 13, 2006) (citations omitted).  In this case, that means that the Court must examine the deposition testimony of the MASMs to discern whether MASMs uniformly carried out similar duties and responsibilities, which would render them executives under the FLSA. However, similarities in the job responsibilities and duties performed by MASMs are not solely enough to establish that plaintiffs are similarly situated "because the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions." *Zavala*, 2010 U.S. Dist. LEXIS 63530, at *7 (internal quotation marks and citation omitted).

Plaintiffs claim that they have an overwhelming amount of evidence to support the demonstration of the exemption issue through common proof.  Plaintiffs argue that the design of the MASM position supports a denial of decertification because Home Depot never evaluated whether the activities performed by the MASMs diverged from the MASM job description, did not engage in any studies to discern how a MASM spends his or her time on the job, and has not reevaluated the exempt status of the MASM position since an "internal evaluation" in 2000.  Plaintiffs cannot rely on common proof evidence of Home Depot's decision to classify the MASM position as exempt because courts have made clear that "[m]erely showing that the employer classified a group of

employees as exempt is not sufficient to establish that [those] employees are similarly situated for the purposes of an FLSA collective action." *King*, 2006 U.S. Dist. LEXIS 3926, at *41 (citation omitted); *see also Morisky,* 111 F. Supp. 2d at 498 (finding defendants' "common scheme" of classifying employees as exempt did not bind class sufficiently such that plaintiffs were "similarly situated"). Additionally, Plaintiffs have not explained why the alleged failure to compare the actual day-to-day activities of MASMs to Home Depot's description of the position or Home Depot's failure to evaluate the exempt status of the MASM position supports continued certification.

Plaintiff continues on to describe Home Depot's centralized corporate structure and appears to advance that such structure causes MASMs nationwide to have identical duties. Quite simply, the deposition testimony of the Opt-Ins does not bear our that Home Depot's centralized corporate structure resulted in MASMs performing identical duties. To the contrary, the MASM testimony clearly evidences that MASM duties and responsibilities significantly varied from MASM to MASM. Courts have recognized that "employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially." *King,* 2006 U.S. Dist. LEXIS 3926, *43 (citing *Morisky,* 111 F. Supp. 2d at 495, 499 n. 8); *see also Mike v. Safeco Ins. Co. of Am.*, 223 F.R.D. 50, 54 (D. Conn. 2004) (denying Rule 23(b) certification and noting "class membership is not founded upon [a company] policy or other generalized proof, but rather on the fact-specific determination of each individual plaintiff's day to day tasks").

Plaintiffs also assert that as a result of a "staffing graph" and policy changes, MASMs have to perform non-exempt duties. Apparently, the performance of those non-exempt tasks overlap with the responsibilities of positions that are non-exempt and the performance of such non-exempt tasks relegates MASMs to non-exempt status. MASM performance of non-exempt tasks or duties as a

result of Defendant's staffing graph, policy change, or corporate structure is of no consequence in this instance because even assuming *arguendo* that Plaintiffs could establish through common proof that MASMs performed non-exempt tasks as a result of a staffing graph, policy change, or corporate structure, the fact that Plaintiffs "may have spent a majority of their time performing non-exempt tasks does not establish sufficient similarities to warrant class certification." *Reyes v. Texas EZPawn, L.P.*, No. V-03-128, 2007 U.S. Dist. LEXIS 1461, *9 (S.D.Tex. Jan. 8, 2007) (citing *Smith v. Heartland Auto. Srvcs., Inc.*, 404 F. Supp. 2d 1144, 1152 (D. Minn. 2005)).  For that same reason, Plaintiffs' additional arguments – that MASMs were charged with the primary duty of customer service, not management and that MASM duties were substantially similar to those of non-exempt employees – do not establish Plaintiffs are similarly situated.  *See id.*

Plaintiffs' final argument is that MASM compensation was less than the non-exempt departments supervisor's compensation thereby evidencing the non-exempt nature of the MASM position.  Plaintiff advances that whether an employee's primary duty is management requires a consideration of the salaried employee's hourly rate of pay when that employee is required to work a minimum number of hours each week.  While compensation is relevant to the exemption analysis, none of the cases utilized by Plaintiffs to support their assertion evidence that such analysis should be employed at the decertification stage of a collective action.  *See Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1239, 1271 (11th Cir. 2008) (considering plaintiff's hourly wage on appeal, following jury trial in collective action)*; Thomas v. SpeedwayAmerica, LLC*, 506 F.3d 496 (6th Cir. 2007) (affirming district court's determination that plaintiff was exempt under the FLSA); *Clougher v. Home Depot, U.S.A.*, 696 F. Supp. 2d 285-86 (E.D.N.Y. 2010) (considering plaintiff's hourly pay rate in individual action for overtime compensation under New York labor law); *Johnson v. Big Lots*, 604

F. Supp. 2d 903, 918 (E.D. La. 2009) (following decertification of collective action, judge considered relationship of plaintiff's hourly wage to subordinates). Again, Plaintiffs argument misses the mark of illustrating that Plaintiffs are similarly situated.

Overall, there are substantial differences in the factual and employment settings of the Opt-Ins. The deposition evidence clearly establishes that MASM job responsibilities and duties varied from MASM to MASM, from store to store, from shift to shift, and in some cases from subordinate employee to subordinate employee. Those significant variations preclude this Court from finding any real uniformity among the Plaintiffs and the Opt-Ins. If collective action certification were maintained, the Court would have to engage in numerous individualized determinations to discern whether each specific Opt-In qualifies as an executive. Therefore, the disparate factual and employment settings of Plaintiffs do not weigh in favor of continued certification.

**B.      Defenses Available to Defendant**

The second factor for the Court to consider is "whether the potential defenses pertain to the opt-in class as a whole or whether, many different defenses will be raised with respect to each individual plaintiff." *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *25 (citing *Moss*, 201 F.R.D. at 409). Courts have granted motions for decertification based on this factor because individualized defenses inhibit the efficiency of proceeding on a collective basis. *Id.* (citing *Moss*, 201 F.R.D. at 410). Nevertheless, it is within the District Court's discretion as to "'whether the potential defenses would make the class unmanageable.'" *Zavala*, 2010 U.S. Dist. LEXIS 63530, at *10 (quoting *Moss*, 210 F.R.D. at 410).

Defendant has indicated that it intends to present individualized evidence as to each Opt-In's claims and that the record reveals that it is not possible to establish the Plaintiffs' daily tasks through

15

common testimony.   Additionally, Defendant intends to bring to light contradictions between individual Plaintiffs' resume statements, declarations or interrogatory answers, and deposition testimony.  Plaintiffs do not present any arguments related to this factor that contradict Defendant's arguments.

The Court finds that the potential defenses of Defendant would make collective treatment of this action unmanageable.  The deposition testimony evidences that it is not possible to develop common testimony from the MASMs regarding their daily responsibilities and duties.  As previously noted, the determination of whether a MASM satisfies the executive exemption criteria is "an individual, fact-specific analysis of each employee's relevant statutory exemption criteria." *Morisky*, 111 F.Supp. 2d at 498; *see also Reyes*, 2007 U.S. Dist. LEXIS 1461, at *26 (acknowledging in defense analysis that "the degree of discretion and authority each [opt-in Plaintiff] exercised varied depending on store management and store demographics, making this case particularly unsuitable for collective treatment when applying exemption analysis").  Defendant is entitled to question each individual Opt-In about his or her managerial responsibilities to illustrate that MASMs qualify as exempt managers.  In addition, Defendant is entitled to impeach the credibility of individual Opt-Ins by bringing to light misrepresentations about duties that they may have made on their resumes.  Further, Defendants may also try to impeach the credibility of individual Opt-Ins by questioning those Opt-Ins about contradictory responses given when providing declarations, interrogatory answers, and deposition testimony.  Such individual questioning would likely make it difficult and confusing for the fact finder to make both credibility determinations and to discern whether each individual Opt-In is exempt under the FLSA.  Indeed, the Appellate Division of the California Superior Court recognized the following difficulties:

16

> In addition to issues of basic honesty, depending on point of view, a MASM may in good faith describe a task differently.  If a MASM is stocking shelves with a number of hourly associates, one MASM may see their role as supervisory, which is an exempt activity, while another MASM might describe it as simply stocking shelves, a non-exempt activity.  At some point, a trier of fact will have [to] make individual decisions on these characterizations and credibility.

*In re Home Depot Overtime Cases*, No. JCCP4229, 2006 WL 330169, *4 (Cal. Super. Feb. 2, 2006). Accordingly, the Court finds that the individualized defenses for each Opt-In weighs against continued certification.

### C.    Fairness and Procedural Considerations

The final factor  "direct[s] the court to consider the primary objectives of the FLSA collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity."   *Reyes*, 2007 U.S. Dist. LEXIS 1461, at *28 (citing *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

Defendant contends that fairness and procedural considerations weigh against collective treatment because litigating this action on a collective basis would confuse the fact finder and unduly prejudice Defendant.  Defendant articulates that judicial efficiency would not be enhanced because (1) the parties would be forced to litigate individualized issues, (2) there is no benefit to the judicial system or litigants because jurors would be overwhelmed by individualized issues and litigants would be required to expend financial resources to travel to a district where they have no ties, and (3) allowing this case to proceed as a collective action would infringe upon Defendant's due process rights because it would be unfair and unmanageable to require Defendant to litigate the claims of 1500 Opt-Ins from across the country in a single action.  Again, Plaintiffs do not appear to advance

17

an argument, which directly controverts Defendant's contentions.

This Court recognizes that allowing Plaintiffs to pursue their claims in a collective action promotes the first objective of § 216(b) in that it may lower the costs to the individual plaintiffs because it allows them to pool resources.  Additionally, allowing this case to proceed as a collective action would promote judicial economy because it would allow for one case to proceed instead of 1500 separate actions.  Nevertheless, the Court must also recognize the potential unfairness and procedural difficulties that may arise in allowing this case to proceed as a collective action.  As previously noted, there are numerous factual differences surrounding the Opt-Ins' day-to-day responsibilities and duties.  Because Defendant intends to explore individualized defenses, which would require the trier of fact to determine whether an individual Plaintiff MASM is exempt under the FLSA, this Court has serious concerns as to whether a collective action would be most efficient and whether the Court could "coherently manage" the collective action without prejudice to the parties.  *Moss*, 201 F.R.D. at 410; *see also Reyes*, 2007 U.S. Dist. LEXIS 1461, at *29.  On balance, this factor weighs in favor of decertification.

Based on the foregoing analysis, the Plaintiffs have not met their burden of establishing that they are similarly situated to the Opt-Ins; rather, all three factors for final collective action certification weigh in favor of decertification.  Accordingly, the conditional collective action is decertified.  In light of that conclusion, the Court will consider Plaintiffs' alternative argument that subclasses for declaratory judgment and training period overtime claims should be created.

18

**V.    CREATION OF SUBCLASSES**

 Plaintiffs argue that this Court should maintain subclasses for both declaratory relief and for training period claims.  First, Plaintiffs assert that in *Dillon v. Coles*, 746 F.2d 998, 1004 (3d Cir. 1984), the Court of Appeals for the Third Circuit held that a class may be entitled to injunctive relief barring the continuation of a discriminating policy, where the representative class establishes that disparate treatment is the employer's standard practice.  Plaintiffs maintain that they have established that Home Depot's blanket policy of classifying all MASMs as exempt is unlawful because Home Depot never tested or analyzed the daily activities of the MASM position before determining that  the position of MASM is exempt from the requirements of the FLSA.

 Plaintiffs cite no authority to support the notion that it is illegal or improper for employers to classify a position as exempt without testing or analyzing the position's daily activities.  Additionally, Plaintiffs do not cite any cases where a § 216(b) subclass was maintained for the purpose of declaratory judgment.  In light of the absence of supporting authority, this Court declines to create a subclass of MASMs for declaratory relief.  Moreover, if evidence that an employer uniformly classified a position as exempt is not enough, in and of itself, to prove that plaintiffs are similarly situated for an FLSA collective action, *King*, 2006 U.S. Dist. LEXIS 3926, at *41, it does not logically follow that such evidence would support the creation of a subclass.

 Second, Plaintiffs argue that the Court should a create subclass for training period claims.  Plaintiffs explain that Defendant is not exempt from its FLSA obligation to provide overtime to MASMs in training because the FLSA specifically excludes training time from the executive exemption.  Plaintiffs argue that MASMs are not executives during their training because Home Depot calls MASMs in training "ASM trainees" or "in training," the training period is temporary in

that it lasts up to eight weeks, and Home Depot gives a training manual to MASMs to complete.  In response, Defendant argues that an ASM trainee subclass would be inappropriate because  "ASM trainees" are a separate and distinct group of employees, Plaintiffs' complaint did not provide fair notice of a training period claim, the Court did not conditionally certify a class of ASM trainees, and Plaintiffs cannot show that ASM trainees are similarly situated.

Considering those arguments, the Court will not create a subclass for ASM training claims. The Central District of California considered whether class certification was proper for ASM training claims in a case brought by two of the Opt-Ins in this case.  *See Menodza v. Home Depot, U.S.A., Inc.*, No. CV 09-05843, 2010 U.S. Dist. LEXIS 13025, *7-9, 32 (C.D. Cal. Jan. 21, 2010).  The arguments advanced by the Opt-Ins before the *Mendoza* Court are similar to the arguments now raised by Plaintiffs.  In rejecting the request for class certification of an ASM training class, the *Mendoza* Court acknowledged that "because there is no uniform policy or standard operating procedure upon which all ASMs and training ASMs rely, it is likely that each ASM's and training ASM's experience is unique."  *Id.* at *25.  Additionally, the *Mendoza* Court echoed this Court's finding in *Novak II*, stating that "where there are dissimilarities between the individual ASM's duties, such 'dissimilarities must be evaluated on a case-by-case basis.'" *Id.* at 27 (quoting *Novak II*, 259 F.R.D. at 106).  In light of the likelihood that an ASM training subclass would require an individualized determination of whether each Plaintiff was an executive during training, the Court declines to create such a subclass for all of the reasons previously expressed in Section IV of this opinion.

20

## VI.    CONCLUSION

For the foregoing reasons,  Defendant's motion to decertify the conditional collective action is granted.  Plaintiffs' request to create certified subclasses for declaratory relief or training period overtime claims is denied.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

February 15, 2011

21